**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ALISON C.,
      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
      Defendant.

No. 3:22-cv-00370 (SRU)

**ORDER**

The plaintiff, Alison C.[1], commenced this action pursuant to 42 U.S.C. § 405(g) to appeal

the decision of the Commissioner of the Social Security Administration (the "Commissioner" or

"Defendant") denying her claim for disability insurance benefits under Title II of the Social

Security Act ("SSA"). Alison C. filed a motion for an order reversing the decision of the

Commissioner or, in the alternative, an order remanding for another hearing. *See* Pl. Mot. to

Reverse, Doc. No. 16. The Commissioner has cross-moved for an order affirming the decision.

*See* Comm'r Mot. to Affirm, Doc. No. 18. For the following reasons, I **grant** Alison C.'s motion,

doc. no. 16, and **deny** the Commissioner's motion, doc. no. 18.


**I.**       **STANDARD OF REVIEW**

The SSA follows a five-step process to evaluate disability claims. *See Selian v. Astrue*,

708 F.3d 409, 417 (2d Cir. 2013). First, the Commissioner determines whether the claimant

currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d

Cir. 2015) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the

---

[1]       As set forth in the January 8, 2021 Standing Order, the plaintiff is identified by her first name and last
initial. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

Commissioner determines whether the claimant has a "'severe' impairment," *i.e.*, a physical or mental impairment that limits his or her ability to do work-related activities. *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "*per se* disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not *per se* disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). A claimant's residual functional capacity ("RFC") is defined as "what the claimant can still do despite the limitations imposed by his impairment." *Id.* Fourth, the Commissioner decides whether the claimant's RFC allows him to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, based on the claimant's RFC, whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is sequential, meaning that a claimant is disabled only if he passes all five steps. *See id.*

"The claimant bears the ultimate burden of proving that he was disabled throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the five-step inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift to the Commissioner at step five." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). At step five, the Commissioner need show only that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the

administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc.*

*Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012); *see also Mongeur v. Heckler*, 722 F.2d

1033, 1038 (2d Cir. 1983) ("[T]he reviewing court is required to examine the entire record,

including contradictory evidence and evidence from which conflicting inferences can be

drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the

factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802

F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more

than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Greek*, 802 F.3d at 375 (cleaned up). Unless the Commissioner relied on an incorrect

interpretation of the law, "[i]f there is substantial evidence to support the determination, it must

be upheld." *Selian*, 708 F.3d at 417.

## II.     BACKGROUND[2]

Alison C. filed an application for Title II benefits on April 16, 2018, alleging that she

suffered from a disability since May 17, 2017. *See* SSA Administrative Record, filed April 28,

2022 (Doc. No. 9) (hereinafter "R."), at 12. Her application was denied initially on March 5,

2019, and again upon reconsideration on June 13, 2019. *Id.* At that point, Alison C. requested a

hearing before an administrative law judge ("ALJ"). *Id.* A hearing was held before ALJ Michael

McKenna on September 2, 2020. *Id.* On September 25, 2020, the ALJ issued an unfavorable

decision, concluding that Alison C. was not disabled within the meaning of the SSA and denying

---

[2]     The relevant period for this appeal is limited to May 17, 2017 to the date of last insured, December 31, 2017.

her claim. *Id.* at 12–22. Alison C. now seeks an order reversing the decision or in the alternative, remanding for a new hearing.

      A.     <u>The Hearing Before the ALJ</u>

Due to the coronavirus pandemic, the hearing before the ALJ was held remotely. Present at the hearing was Alison C. and her attorney, Richard B. Grabow ("Grabow"). An impartial vocational expert, John Bopp ("Bopp"), was also present. All participants attended the hearing by telephone. The ALJ was tasked with determining whether Alison C. was disabled between the period from May 17, 2017 to December 31, 2017.

At the administrative hearing, Alison C. testified that, during the relevant period, she resided at her father's house. R. at 34. According to Alison C., she successfully completed her GED. R. at 35. Thereafter, she enrolled in a dental assistant course and attended two classes. *Id.* But she testified that her training was cut short due to the onset of symptoms she began to experience. *Id.*

Next, Alison C. testified regarding her prior employment. Per Alison C., her first employment position was at Petco. R. at 35–38. In that role, she was primarily a cashier, but also restocked the shelves and took care of the animals. *Id.* Alison C. was also employed as a cashier at Ocean State and a housekeeper in Ithaca, New York. R. at 39. She last worked for Twitch, where she would sporadically get paid to stream video games. R. at 40. Eventually, she stopped streaming due to the onset of her symptoms, noting that she "never [knew] when the pain" was going to get bad. *Id.*

Attorney Grabow asked Alison C. a series of questions about the impact of her symptoms. Alison C. testified that she was unable to do any chores around her father's household; instead, her father and boyfriend would do them. R. at 44. She explained that when

she was first diagnosed with multiple sclerosis, she could not walk and required a cane to

ambulate. *Id.* Further, Alison C. testified that she required assistance with personal care, such as

brushing her teeth, showering and toileting. R. at 44–46. When showering, her boyfriend would

often stay with her to ensure that she did not fall. R. at 46. She also testified that she does not

drive, which meant she relied upon her boyfriend to get around. R. at 34–35.

Alison C. testified about the nature and severity of her symptoms. She described having

frequent tremors, fatigue, and ataxia (i.e., trouble walking). R. at 50–52. In describing her

treatment, Alison C. testified that she began Tysabri infusions, treatment for people with

relapsing forms of multiple sclerosis, shortly after her diagnosis in May 2017. R. at 55. Per

Alison C., those four-hour infusions would produce "the biggest headache" she ever had, akin to

the feeling of "swelling." R. at 56–57. She described the severity of pain as an eight out of ten.

R. at 57. Moreover, her fatigue "tripled" because of the infusions. R. at 56. After completing an

infusion session, she testified that she would recover for three or four days and would not do

anything during that time. *Id.*

Upon Attorney Grabow's questioning, Alison C. provided a more in-depth analysis about

the severity of the pain associated with trigeminal neuralgia. Alison C. testified that she has

Type-2 trigeminal neuralgia, which she described as "atypical." R. at 59. Consequently, her pain

is "constant." *Id.* Alison C. testified that she gets "the most awful" pain, described as a "burning,

stabbing" pain that affects both sides of her face. R. at 59–60. Per Alison C., ordinary activities

can trigger an onset of pain, such as eating, brushing her teeth, and talking too much. *Id.* Indeed,

she explained that she speaks with a monotone voice to avoid triggering her symptoms. R. at 59.

She described getting headaches a least a couple of times a week that would last almost all day.

R. at 60–63. In her words, the baseline severity of her headaches was about a seven or eight out

of ten; but when triggered, it would be a "ten or more," with pain that could last for "minutes" or "hours." R. at 63. She testified that the pain was so bad that she went to the emergency room, which is ultimately what led to her multiple sclerosis and trigeminal neuralgia diagnosis. R. at 59–60.

Per Alison C., the fear of experiencing pain led to mental health issues, such as anxiety and depression. R. at 63–64. She described that "a simple breeze" could be enough to cause pain, so she became anxious about leaving the house. R. at 64. Further, she testified that she tried to avoid basic things. *Id.* According to Alison C., tooth pain can trigger her symptoms, so she had teeth taken out that did not need to be taken out. R. at 59. Under the ALJ's questioning, Alison C. disclosed that she spent her days at her father's house, usually locked in her room because she was in so much pain. R. at 71. Alison C. testified that she still experiences pain today, such that her baseline is now a six or seven out of ten. R. at 73–74. But she testified that the pain she experiences today is not as severe as it was in 2017, which was the worst period. *Id.*

The vocational expert, Mr. Bopp, also testified. The ALJ asked Mr. Bopp a series of hypotheticals, including whether a person of the same age, educational and vocational profile as Alison C., with the ability to perform light work, stand and walk for two hours in an eight-hour day and sit for six hours in an eight-hour day, and can occasionally climb ramps and stairs, could perform Alison C.'s past work. R. at 75–77. Mr. Bopp answered in the negative but opined that such an individual could perform other regional and national jobs. R. at 76. Further, Mr. Bopp opined that if a person were absent more than two days a month, she would not be able to maintain employment. R. at 77–78. Additionally, Mr. Bopp testified that if an individual were to off-task 10% of the time, it would preclude all competitive employment. R. at 78.

B.    Medical Evidence[3]

1.    *Treatment Notes*

In April 2017, Alison C., only twenty-nine at the time, was diagnosed with multiple sclerosis. R. at 2236. Related to that diagnosis, she suffered with severe bilateral facial pain, which was later diagnosed as trigeminal neuralgia. *Id.* The latter diagnosis is the focus of this appeal, so I focus on that history.

Long before Alison C.'s trigeminal neuralgia diagnosis, she experienced varying degrees of facial pain. In April 2017, she was evaluated by an internist. During that examination, Alison C. reported that she was experiencing jaw pain and had been experiencing such pain for four years. R. at 496. She further indicated that she was seeing an oral surgeon due to the jaw pain and described that she was initially diagnosed with temporomandibular joint dysfunction ("TMJ"), which is a disorder that affects the jaw joints and surrounding muscles and ligaments. *Id.* That, coupled with her complaints of chronic headaches, prompted the internist to order an MRI and refer her to a neurologist. R. at 499.

The MRI was conducted on April 5, 2017. R. at 2234. Based on those results, the radiologist made two findings. First, the images raised a "suspicion of multiple sclerosis." R. at 2235. Second, the images showed a dominant enhancing lesion involving the left hemipons that "likely contributes to [Alison C.'s] facial pain symptoms." *Id.*

The following day, Alison C. was seen in urgent care for complaints of "scattered weakness." R. at 594. At the time, she presented with weakness, gait disturbance, ataxia, dizziness, and tenderness bilateral jaw. *Id.* The examining doctor observed that Alison C.'s

---

[3]    The following facts are drawn primarily from Alison C's Statement of Material Facts, doc. no. 16-2, to which the Commissioner largely adopted, doc. no. 18-2.

complaints of headache were consistent with TMJ, whereas the remainder of the symptoms she was experiencing were consistent with multiple sclerosis. R. at 595.

For the next several weeks, Alison C.'s symptoms persisted. R. at 437–95. During that time, her symptoms fluctuated in degrees of severity. For instance, she reported during an examination on April 18, 2017 that her "facial pain is better" and "essentially gone," but new pain was emerging, such as neck pain and eye symptoms. R. at 487. She continued to have difficulty walking, such that she began physical therapy. R. at 487, 493. Similarly, she reported in early May 2017 that her jaw pain is "better" but was experiencing right foot pain. R. at 483.

Throughout May 2017, Alison C. attended various physical therapy sessions. During those sessions, moderate tremors were noted in all active range of motion ("AROM") exercises. R. at 2250–52. Further, the physical therapist observed that strengthening tasks caused a significant onset of fatigue. R. at 2251. In one appointment, Alison C. reported that it takes time for the tremors to calm down in the morning after she wakes up. *Id.* at 2256.

On May 17, 2017, Alison C. was observed by neurologist, Dr. Tremblay. R. at 475–82. During that appointment, Alison C. reported that her walking has improved since starting physical therapy. R. at 475. Further, she reported significant improvement in her multiple sclerosis symptoms with steroids and physical therapy, which was expected. R. at 481. Still, she also described ongoing muscle spasms and poor balance. R. at 475–76. Examination showed intact casual gait and mildly unsteady walking. R. 479. Overall, Dr. Tremblay's impression was that she was experiencing relapsing multiple sclerosis, and her "severe" condition required "aggressive" treatment. R. at 481.

In June 2017, Alison C. returned to her internist twice. During the first appointment, occurring on June 20, Alison C. reported that "fatigue has been an issue." R. at 471. Regarding

her facial pain, she stated that the pain was still ongoing and intense, though less frequently. *Id.*
She also indicated that her walking was better, and that she tries to exercise at home. *Id.* Six days
later, on June 26, Alison C. was seen again by her internist where she complained about the side
effects of her medications and reported much anxiety over her multiple sclerosis diagnosis. R. at
467.

The following month, Alison C. had a follow-up appointment with Dr. Tremblay. During
that appointment, she reported that her walking was better, but her facial pain and muscle spasms
continue. R. at 459–60. Additionally, Alison C. described that she is tolerating the Tysabri
infusions, albeit with some side effects. R. at 460. A physical examination was completed, which
went from stable to improved. R. at 466. Further, Alison C. showed intact facial sensation and
full facial expressions. R. 463.

For the next several months, Alison C.'s symptoms continued to fluctuate. In August
2017, she had a follow-up with her internist. She reported medical marijuana use, which had
been helping with her facial pain. R. at 455. A month later, she reported being "miserable" in a
follow-up appointment with Dr. Tremblay. R. at 448. During that follow-up, in addition to
symptoms of neck pain, she reported headaches associated with the Tysabri infusions. *Id.* At that
point, she had completed four infusions, although the most recent one did not cause any
headaches. *Id.* Moreover, she reported an onset several bacterial infections, which per Dr.
Tremblay, was "not typical of Tysabri treatment." R. at 454. Alison C. reported that she stopped
taking Tripleptal, medication for her facial pain, because it was not working. R. at 448.  Instead,
she reported using medical marijuana and applying ice to her face for severe pain about once a
week. *Id.* Overall, she denied any evidence of new relapses. *Id.* In November 2017, she reported
depression, fatigue and a vertigo spell to her internist. R. at 443–45. And in December 2017, she

denied having any new relapse symptoms in another follow-up with Dr. Tremblay. R. at 436.

She continued to take medication for her facial pain and do light aerobic exercise, as

recommended by her treating physicians. R. at 429. A physical examination appeared stable with

motor bulk and tone, 5/5 power throughout, mild lower extremity vibratory loss, intact reflects,

and instant casual gait with subtle unsteady tandem walking. R. at 433, 436. Overall, Dr.

Tremblay concluded that her multiple sclerosis appears to be stable owing to the Tysabri

infusions, so he recommended that she continue that treatment every 28 days. R. at 436.

### 2.  *Medical Opinions*

The record also contains several medical opinions; two of relevance for deciding this

appeal. In February 2020, APRN Marina Creed, one of Alison C.'s treating providers, completed

a functional assessment indicating that Alison C. has experienced severe physical deficits since

2017. R. at 2228–33. Specifically, she opined that Alison C. could not lift any amount of weight

at any frequency. R. at 2228. Further, she opined that Alison C. could only sit for four hours total

and stand or walk for one hour total during an eight-hour workday. R. at 2229. She opined that

Alison C. would be absent from work four or more times per month, and off-task 20 percent or

more of the day. *Id.*

In March 2020, Dr. Tremblay also submitted a letter on Alison C.'s behalf. R. at 2236.

Therein, he described that he treated Alison C. for multiple sclerosis from April 2017 to April

2018. *Id.* He explained that multiple sclerosis typically results in permanent scarring, i.e., lesions,

of brain tissue. *Id.* In Alison C.'s case, the location of the most significant lesion "resulted in

persistent trigeminal neuralgia, imbalance/ataxia, vertigo, and stiffness of her extremities." *Id.*

He further added that trigeminal neuralgia "is often described as one of the most debilitating pain

disorders." *Id.* And despite the various treatments she received, Alison C.'s trigeminal neuralgia

condition remained "fairly refractory." *Id.* Based on those records, Dr. Tremblay opined that she could occasionally lift up to fifty pounds, and that she could sit for six hours total and stand or walk for two hours total in an eight-hour workday. R. 2237–38. Further, he opined that she would likely be absent from work two or three times per month, and off-task for 0-10% of the workday. R. at 2238.

      C.     <u>ALJ's Decision</u>

The ALJ concluded that Alison C. had not been under a disability since May 2017, when she filed her application for disability benefits. R. at 14. The ALJ followed the five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. At step one, the ALJ found that Alison C. had "not engaged in substantial gainful activity" for the period from May 17, 2017 through December 31, 2017. R. at 14. At step two, the ALJ found that she had one severe impairment: multiple sclerosis. *Id.* The ALJ further found Alison C.'s other conditions— trigeminal neuralgia, neck pain, anxiety, depression and attention deficit hyperactivity disorder— were not severe. R. at 14–15. At step three, the ALJ held that Alison C.'s impairments, individually and collectively, did not render her *per se* disabled according to the definitions in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 16.

Before proceeding to step four, the ALJ determined Alison C. retained the RFC to perform less than the full range of light work as defined in C.F.R. § 404.1567(c)). R. at 16–20. Specifically, the ALJ determined that she could:

- (1) occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds;
- (2) stand/work for 2 hours in an 8-hour day;
- (3) sit for 6 hours in an 8-hour day;
- (4) occasionally climb ramps and stairs but never ladders, ropers, or scaffolds; and
- (5) occasionally balance, stoop, kneel, crouch, and crawl.

R. at 16–17. The ALJ also determined that Alison C. must avoid extreme temperatures and hazards. R. at 17.

At step four, the ALJ determined that, given that RFC, Alison C. was unable to perform her past relevant work. R. at 20–21. At the fifth and final step, the ALJ considered whether Alison C.—who was 30 years old when the application was filed, had a high school education, and had previously worked as a cashier/checker and animal caretaker—could do other work "exist[ing] in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(1); *see also* R. at 21. Relying on Mr. Bopp's testimony, the ALJ concluded that Alison C. was capable of making an adjustment to other work, specifically, the job of a "small products assembler," a "collator operator," and a "document preparer." R. at 22.

## III.    DISCUSSION

On appeal, Alison C. argues that the ALJ erred by (1) assigning improper weight at step two and thereafter step four, in evaluating Alison C.'s condition of trigeminal neuralgia, and the pain caused by said condition; and (2) assigning improper weight to the relevant medical opinions from treating and non-treating sources in assessing Alison C.'s trigeminal neuralgia. *See generally* Alison C.'s Mem. of Law ("Pl. Mem. of Law"), Doc. No. 16-1, at 2.  The Commissioner counters, by arguing that substantial evidence supports the ALJ's decision that Alison C. did not establish a disability during the relevant period. *See generally* Comm'r Mem. of Law in Supp. of Mot. to Affirm ("Comm'r Mem. of Law"), Doc. No. 18-1.

### A.    Severity of Trigeminal Neuralgia

#### *1.    Step Two*

First, Alison C. contends that the ALJ erred at step two in deciding that trigeminal neuralgia was not severe. It is well established that "an ALJ's failure to classify an impairment as

severe at step two is harmless if the ALJ finds other severe impairments and considers the omitted impairment in the subsequent analysis." *Sandra C. v. Saul*, 2021 WL 1170285, at *4 (D. Conn. Mar. 29, 2021).

As applied here, in determining Alison C.'s RFC, the ALJ considered all her impairments—including trigeminal neuralgia— even if cursorily. For example, the ALJ relied on Dr. Tremblay's treatment records which, as discussed above, repeatedly referenced Alison C.'s trigeminal neuralgia symptoms. Furthermore, the ALJ's analysis mentions Alison C.'s description of her facial pain. R. at 20 ("noting that, she reported that she had severe bilateral facial pain"). Given that, any error at step two was harmless. *See, e.g., O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding ALJ's omission of right knee impairment at step two to be harmless error because ALJ found other severe impairments and "specifically considered" right knee dysfunction in subsequent steps); *see also Nicholas C. v. Kijakazi*, 2022 WL 1204929, at *5 (D. Conn. Apr. 22, 2022) (collecting cases). That said, the question remains whether there was an error at step four, or in the alternative, whether substantial evidence supports the ALJ's RFC finding.

2.      *Step Four*

Alternatively, Alison C. also contends that the ALJ's assessment at step four lacks substantial evidence. As already mentioned, the ALJ determined that Alison C. retained the RFC to perform less than the full range of light work. To get there, the medical records on which the ALJ relied largely consist of the results of physical evaluations and diagnostic imaging. R. at 18, 20 (discrediting the severity of Alison C.'s symptoms because "diagnostic imaging and physical examinations were frequently normal" and "multiple physical examinations from 2017 show normal ambulatory abilities and full motor strength throughout"). But those records say nothing

about Alison C.'s *subjective* pain; pain that Alison C.'s treating provider described as "debilitating." Put another way, two things can both be true: Alison C. could have a normal physical examination, while also still experiencing pain symptoms that impede her ability to perform work-related functions.

Take the monthly Tysabri infusions she completed for example. As the medical records establish, that treatment was effective in managing her multiple sclerosis, though not without cost. She reported headaches and severe fatigue following almost every transfusion. Further, she reported feeling those symptoms for days after the infusion. Yet, the ALJ does not discuss that at all. That omission is even more concerning considering that the ALJ discredited both APRN Creed and Dr. Tremblay's assessments that Alison C. would likely need to be absent from work at least 2-3 days a month. R. at 20.

In addition, the record is replete with Alison C.'s complaints of the severity of her pain, both from self-reports and her treating physicians' assessments. Especially as it relates to her trigeminal neuralgia. As the Second Circuit has instructed, "[e]vidence of pain is an important element in the adjudication of [disability claims], and must be thoroughly considered in calculating the RFC of a claimant." *See Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010). From what I can glean, the ALJ disregarded ample evidence of pain in the record based solely on the results of physical evaluations and diagnostic imaging. But those records cannot by themselves support the RFC because those records simply do not address how Alison C.'s reported feelings of pain impact her ability to work. As such, I cannot conclude that there is substantial evidence to support the RFC. Accordingly, remand is necessary. *See, e.g, Quineila B. v. Kijakazi*, 2022 WL 2604593, at *5 (D. Conn. July 8, 2022) (remanding case where ALJ's

decision rested entirely on the results of physical evaluations and diagnostic imaging but failed to address the claimant's specific ability to perform work-related functions).

Alternatively, and relatedly, the ALJ does not appear to have properly considered Alison C.'s subjective complaints in a meaningful way. Social Security regulations provide that statements of subjective pain alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529 (a)). Instead, an evaluation of subjective complaints should reflect a two-step analysis. *See* 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptoms. 20 C.F.R. § 416.929(a).  Next, the ALJ must evaluate "the intensity, persistence, or functionally limiting effects of [the] symptom[s]," considering:

> (1) The individual's daily activities;
>
> (2) The location, duration, frequency and intensity of pain or other symptoms;
>
> (3) Factors that precipitate and aggravate the symptoms;
>
> (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529 (c)(3)(i)-(viii), 416.929(c)(3)(i)-(vii). Where an ALJ rejects a claimant's subjective testimony after considering the objective medical evidence and any other factors deemed relevant, the ALJ must explain that decision "explicitly and with sufficient specificity that a reviewing court must be able to decide whether there are legitimate reasons for the ALJ's

disbelief and whether [the] decision is supported by substantial evidence." *Gary C. v. Comm'r of Soc. Sec.*, 2022 WL 3443834, at *4 (W.D.N.Y. Aug. 17, 2022) (quoting *Norman v. Astrue*, 912 F. Supp. 2d 33, 43 (S.D.N.Y. 2012)). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (cleaned up).

The ALJ found that Alison C.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded that her statements about the intensity, persistence, and limiting effects of those symptoms were not entirely credible. Despite making that determination, the ALJ does not appear to have conducted a credibility assessment consistent with 20 C.F.R. § 404.1529(c)(1). As far as I can discern, the ALJ's decision contains no meaningful discussion of any of the seven factors, though he was required to consider each of them. *See, e.g, Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013) (finding error where the ALJ did not explicitly refer to or discuss any of the factors in the written opinion). Nor did the ALJ specify the weight, if any, he gave of Alison C.'s subjective statements. *See, e.g., Vellone on behalf of Vellone v. Saul*, 2021 WL 2801138, at *4 (S.D.N.Y. July 6, 2021) (when ALJ discounts a claimant's testimony, he "must provide specific reasons for the finding on credibility, supported by the evidence in the case record, and he must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight he gave to the individual's statements and the reasons for that weight.") (cleaned up). Moreover, the ALJ did not "identify what facts he found to be significant, [or] indicate how he balanced the various [credibility] factors." *Simone v. Astrue*, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009).

That oversight is compounded, in my view, when considering Alison C.'s trigeminal neuralgia condition. The type and frequency of pain Alison C. has described is entirely consistent with the medical literature and the assessments of Alison C.'s treating physicians. Per the National Institute of Health, trigeminal neuralgia:

> is a type of chronic pain disorder that involves sudden, severe facial pain. It affects the trigeminal nerve, or fifth cranial nerve, which provides feeling and nerve signaling to many parts of the head and face.
>
> The intensity of pain can be physically and mentally devastating. [Trigeminal neuralgia] attacks typically stop for a period of time and then return. In some cases, the condition can be progressive, meaning that the attacks can get worse over time, with fewer and shorter pain-free periods before they recur.[4]

Likewise, the Mayo Clinic describes trigeminal neuralgia as:

> a condition that causes painful sensations similar to an electric shock on one side of the face. This chronic pain condition affects the trigeminal nerve, which carries sensation from your face to your brain. If you have trigeminal neuralgia, even mild stimulation of your face — such as from brushing your teeth or putting on makeup — may trigger a jolt of excruciating pain.[5]

Indeed, Dr. Tremblay opined that Alison C.'s particular condition resulted in *persistent* trigeminal neuralgia and described her symptoms as "refractory." And though not dispositive, it is worth noting that trigeminal neuralgia is frequently classified as a "severe" impairment in this context. *See Dibble v. Colvin,* 2016 WL 3647879, at *9 (N.D.N.Y. July 1, 2016) (noting that, ALJ found that trigeminal neuralgia constituted "severe" impairment); *Snyder v. Comm'r of Soc. Sec.*, 2016 WL 1060304, at *2 (N.D.N.Y. Mar. 15, 2016) (same); *Dejohn v. Colvin*, 2015 WL 4662817, at *2 (W.D.N.Y. Aug. 6, 2015) (same). Despite the well-recognized symptoms associated with trigeminal neuralgia as explained by medical literature and Alison C.'s treating

---

[4]  *See* Trigeminal Neuralgia Fact Sheet, https://www.ninds.nih.gov/health-information/disorders/trigeminal-neuralgia (last visited: March 21, 2023).

[5]  *See* The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/trigeminal-neuralgia/symptoms-causes/syc-20353344 (last visited: March 21, 2023).

providers, all of which tend to reflect progression, treatment, and results consistent with at least some of Alison C.'s testimony, the ALJ's decision does not reflect consideration of Alison C.'s testimony.

To be clear, I make no determination of Alison C.'s credibility. Instead, I hold that the ALJ's decision does not reflect that he engaged in the required credibility analysis. His failure to do so is significant because my review of the record suggests that Alison C.'s description of her subjective pain is consistent with the medical record and medical literature. Of course, the ALJ can conclude otherwise, but he must do so after engaging in a credibility analysis and explaining what weight he gave to her statements so that the reviewing court can determine whether that decision is supported by substantial evidence.[6] *See Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) ("An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (cleaned up). Accordingly, remand is appropriate for this reason. *See Gonzalez v. Kijakazi*, 2022 WL 3330346, at *13 (S.D.N.Y. Aug. 12, 2022) (remanding case where ALJ failed to consider all the

---

[6]     The Commissioner contends that substantial evidence supports the ALJ's decision because the record "showed improvement in her symptoms after starting MS treatment." Comm'r Mem. of Law., Doc. No. 18-1, at 5. That argument is insufficient for two reasons.
         First, the ALJ never states that his decision turns on Alison C.'s perceived improvement. That is instead the Commissioner's rationalization for the ALJ's decision. However, "[a] reviewing court may not accept appellate counsel's post hoc rationalizations for agency action." *Wolf v. Berryhill*, 2017 WL 5166567, at *4 (W.D.N.Y. Nov. 8, 2017) (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require [a district court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). As already mentioned, the primary rationale offered by the ALJ is that Alison C.'s physical examinations show "few significant objective limitations." R. at 18.
         Second, even if the Commissioner's view was correct, the aforementioned issue remains: the ALJ neglected to analyze how Alison C.'s experiences of pain, even if improved (which is debatable), impacted her ability to perform work-related functions.

facts required in determining the credibility of the claimant's symptoms and their limiting effects).

      B.    <u>Weight of Medical Opinions</u>

Alison C. also argues that the ALJ assigned improper weight to the relevant medical opinions. Because remand is warranted on another basis, I will not reach those arguments. The ALJ is free to consider them on remand.

## IV.    CONCLUSION

For the foregoing reasons, I **grant** Alison C.'s motion to reverse the decision of the Commissioner, doc. no. 16, and **deny** the Commissioner's motion to affirm, doc. no. 18.  The decision of the Commissioner is **reversed** and the case is **remanded** for further proceedings consistent with this ruling.

So ordered.

Dated at Bridgeport, Connecticut, this 21st day of March 2023.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge